## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 48 STATE STREET, APT 101, BIDDEFORD, ME 04005-5272 | No. 2:23-mj-141-KFW |

### AFFIDAVIT IN SUPPORT OF A
### SEARCH WARRANT APPLICATION

I, Stephanie L. Rattigan, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and am currently assigned to the FBI Boston Division - Portland, Maine Resident Agency, where I am an Agent on the Southern Maine Gang Task Force. I have been a Special Agent since January 2017. I received 21 weeks of training at the FBI Academy in Quantico, Virginia. Prior to becoming a Special Agent, I had two prior roles in the FBI: the first as an Operational Support Technician from 2011 to 2014, and the second as a Staff Operations Specialist from 2014 to 2017. I have been trained in various aspects of law enforcement, to include specialized training in evidence collection as a member of the FBI's Evidence Response Team. I have investigated various types of violent crimes in the States of New Jersey and Maine, to include crimes involving fugitives, criminal enterprises, bank robberies, kidnappings, narcotics, violent crimes against children, missing persons, crimes aboard aircrafts, and crimes on the high seas. I have attended specialized training by the FBI in Basic Cellular Analysis and have attended the NYPD Special Victims Investigators Course by the NYPD Special Victims Unit. I have participated in the execution of numerous arrests and warrants authorizing the search of

residences and the search and seizure of computers, computer equipment, software, and electronically stored information.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the location more specifically described in Attachment A of this affidavit, including any electronic devices found at 48 State Street, Apt. 101, Biddeford, ME 04005 (the "Subject Premises"), for contraband and evidence, fruits, and instrumentalities of violations of Title 18, U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography) and 2252A(a)(2) and (b)(1) (receipt or distribution of child pornography).

3. The statements contained in this affidavit are based on information provided by other FBI Special Agents; information gathered from requests to other agencies and the service of administrative subpoenas; analysis by FBI Special Agents and analysts; physical surveillance; and my experience, training and background in law enforcement.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant.

## PROBABLE CAUSE

5. In or about May of 2022, FBI Headquarters, Criminal Investigative Division, Child Exploitation Operational Unit (CEOU) conducted an operation targeting websites and applications dedicated to the distribution, advertisement, and production of Child Sexual Abuse Material (CSAM).

6. On or about May 3, 2022, an FBI Online Covert Employee (OCE) was connected to the internet in an online undercover capacity. A software program was

used to record the online activity, chats, and videos identified within the platforms Wickr and Mega.

7. Wickr is an end-to end encrypted service that enables secure one-to-one and group messaging, voice and video calling, file sharing, and screen sharing.

8. Mega is a secure cloud storage service with end-to-end encryption that allows the upload of files to a cloud-based server. Mega accounts come with free cloud storage upon creation. A Mega user does not need to create an account to view or access a link; they can simply download the link and can share that link with anyone.

9. On May 3, 2022, the OCE entered the Wickr chat and observed Wickr user mcmxcii6@protonmail.com share Mega link https://mega.nz/folder/T0oGiahA#1is3xMlinkPRBAxmjLwmng in the Wickr group chat titled "This group is now inactive."

10. The following titled chat rooms were visible on the left side panel within the Wickr group chat screenshot taken by the OCE:

- pedo lives matter
- we love little1's
- hc pedo babies and toddlers
- anarchy porn group
- kids + teens zoo
- no limits
- the abducters
- perv clubhouse 2021
- nepi rape and abuse
- younger girl the better
- jailbait share no preteen
- CopAFeel
- WTF
- braces
- braces 2.0 in cleaning
- users from viphentai
- reactions

- VIP – verified no rules
- cumsluts
- tiny girls – in cleaning
- abandoned perv club
- hardcore (pain, violence…)

11.     The above-described Mega link shared within the group chat contained numerous Child Sexual Abuse Material (CSAM) videos.

12.     Within the screen recording captured by the OCE, there were approximately 519 videos of pre-pubescent females performing sexual acts on themselves or a male or posing in a lascivious manner.

13.     Of the approximately 519 videos, the OCE downloaded approximately six full sample videos ranging from 12 seconds to 5 minutes and 42 seconds.

14.     One of the sample videos downloaded by the OCE showed a pre-pubescent brunette-haired female, wearing a white sweatshirt, mustard-colored pants, and white underwear, holding a beige cat.  In the video, the minor female takes off her clothes and manipulates her own vagina by pulling it open wider and posing in a sexual nature. The minor female then pulls a male's penis out of his pants and begins to rub it.  In the video, the male attempts to put his penis near the female's mouth, and the female exclaims "yuck" and turns away. The video ends with the female wiping the male's penis with her sweatshirt and beginning to lick the top of his penis. The video is 4 minutes and 27 seconds in length. The male's face is not visible in the video.  A screenshot taken from this video is submitted herewith under seal as Exhibit 1.

15.     Another video downloaded by the OCE shows a pre-pubescent blonde-haired female on a chair in front of a computer, rubbing her vagina with liquid. The video ends with the female trying to insert a blue object into her anus. The video is one

4

minute in length. A screenshot taken from this video is submitted herewith under seal as Exhibit 2.

16. Finally, another video downloaded by the OCE shows a pre-pubescent brunette-haired female inserting an object into her vagina and then licking the object. The video was 5 minutes and 42 seconds in length. A screenshot taken from this video is submitted herewith under seal as Exhibit 3.

17. After the OCE downloaded the above-described videos, a request was sent to the New Zealand Department of Internal Affairs (NZ DIA), which is the foreign law enforcement point of contact for Mega. NZ DIA returned an Excel spreadsheet with the Basic Subscriber Information (BSI) of the owner of the account that created the above-described link containing CSAM. The information is as follows:

>E-mail: afuentedom@protonmail.com
>
>First name: Fuent
>
>Last name: Dom

18. Mega also provided various internet protocol (IP) addresses that were associated with the link owner. On May 11, 2022, CEOU served an administrative subpoena on Charter Communications, Inc. for the following IP addresses:

a. 2603:7081:2341:9c00:49bf:1110:23bb:7430 used on February 11, 2022 at 12:24:21 UTC;

b. IP Address: 2603:7081:2341:9c00:a869:95f4:1ad3:1a06 used on February 9, 2022 at 12:51:15 UTC;

c. IP Address: 2603:7081:2341:9c00:6055:e04:3c4b:df24 used on February 8, 2022 at 10:42:10 UTC.

19. Charter Communications subsequently provided the following information about the subscriber:

>Name: Aaron Coy
>
>Address: 48 State Street, Apt. 101, Biddeford, ME 04005-5272
>
>Email: aaronwcoy@gmail.com
>
>Telephone: 208-201-9417
>
>Connection Date: 06/24/2019
>
>Account Status: Active

20. On June 28, 2022, CEOU performed open-source research and analysis on the identifiers associated with the subscriber and identified the following individual:

>Aaron William Coy, DOB: x/x/1992; SSAN: xxx-xx-7414;
>
>Current address: 48 State St, Apt 101, Biddeford, ME;
>
>E-mail addresses: aaroncoy1309@hotmail.com; aaroncoy@msn.com and cy2rich@yahoo.com.

21. A Maine driver's license query confirmed that Aaron Coy resides at the Subject Premises and owns a black 2014 Volkswagen Tiguan bearing Maine license plate number 1068ZB. The vehicle is co-owned by Aaron Coy and his wife, Rachel Coy. A Maine driver's license query for Rachel Coy confirmed that she also lives at the Subject Premises

22. On August 1, 2022, CEOU sent a lead to the FBI Boston Division, Portland, ME Resident Agency with the above information and requested that agents locate the Mega user who shared the link containing CSAM.

23. On September 8, 2022, Special Agents Andrew Drewer and Mark Miller conducted physical surveillance at the Subject Premises and made the following observations: The house at 48 State Street is a white, two-story, multi-unit house. There are four electric meters on the left side of the house, which indicates that there are four apartments with the house. There is a small parking lot behind the house, which

appears to serve only that building. On September 15, 2022, Detective Bob Perkins of the Biddeford Police Department conducted physical surveillance at 48 State Street, Biddeford, Maine. Aaron Coy's registered vehicle, a black 2014 VW Tiguan, was parked in the right-side driveway of the multi-unit residence.

24. On February 7, 2023, I and Special Agent Adam Morin conducted physical surveillance at 48 State Street in Biddeford, ME. I observed Aaron Coy's black 2014 Volkswagen Tiguan parked and unoccupied on the right side of the driveway. I then observed Coy exit apartment 101, which is the first door on the right side of the residence, wearing a black puffer jacket and a black beanie style hat. Coy went to his vehicle, then re-entered the residence.

**COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

25. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26. *Probable cause.* I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can

7

be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

27.  *Characteristics of child pornography offenders*. As set forth above, probable cause exists to believe that an individual at the Subject Premises has distributed, transported, received, or possessed child pornography. Based upon my

8

knowledge and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals involved in such crimes:

    a.    Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals oftentimes use these materials for their own sexual arousal and gratification.

    b.    Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

    c.    Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

  d. Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes also may correspond with and/or meet others to share information and materials; they rarely destroy correspondence from other child pornography distributors/collectors; they conceal such correspondence as they do their sexually explicit material; and they often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

 28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the Subject Premises because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times

the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to

11

understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

c.      Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

d.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

e. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

f. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

29. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  **The time required for an examination**. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  **Technical requirements**. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  **Variety of forms of electronic media**. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

31. *Outbuildings and motor vehicles.* Based on my training and experience I know that much of the media referenced above, which may contain contraband, fruits and evidence of crime, is by its very nature portable, this includes, as an example but is not limited to, extremely compact storage devices such as thumb drives, laptop computers, and smart phones. In my training and experience, I know it is not uncommon for individuals to keep such media in multiple locations within their premises, including in outbuildings and motor vehicles.  Therefore, this warrant application also seeks authorization to search the above-described black 2014 Volkswagen Tiguan bearing Maine license plate number 1068ZB if it is found at the Subject Premises.

32. It is possible that the Subject Premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

33. I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

*Stephanie L. Rattigan*

Stephanie L. Rattigan
Special Agent, FBI

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: May 17 2023

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title